### William F. Manson, Appellee, v. Culver Military Academy, Appellant.

#### Gen. No. 13,899.

CONTRACTS—*when amount paid for tuition, etc., of dismissed student cannot be recovered.* The amount paid for the tuition, etc., of a student in a military academy, cannot be recovered by the party paying the same in the event of a dismissal for alleged insubordina-

tion, unless it appear that the dismissal was the result of an action so unreasonable and oppressive as to warrant the conclusion that the same was malicious, unfair or prompted by some improper motive or by some motive other than a due enforcement of the regulations of the institution.

Assumpsit. Appeal from the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Reversed with finding of facts. Opinion filed May 19, 1908.

**Statement by the Court.** In an action of *assumpsit,* plaintiff had judgment for $200, and the defendant appealed.

The defendant, the Culver Military Academy, a corporation, carried on a military school for boys. Plaintiff Manson made a written application to said corporation for the admission of his son to said academy, which was in part as follows: "I desire to enter my son as a cadet in Culver Military Academy, for the year commencing September 16, 1903, and ending June —, 1904, subject to the conditions of your printed catalogue and the regulations of the academy."

The printed catalogue referred to in said application contained the following provision:

"It is a condition upon which cadets are admitted that they shall remain at the academy until the end of the school year, unless they are dismissed, suspended or withdrawn, in which case no money will be refunded.

Should sickness detain cadets from the academy longer than one month, $5 per week will be refunded as the estimated cost of board and laundry."

Defendant's charge for board, room, laundry, tuition, etc., was $450 per year, whereof $250 was payable on entrance and $200 on the first of January following. Plaintiff's son entered the academy September 18, and was dismissed November 17, 1903. Plaintiff paid defendant the $250 payable in advance for board, room, tuition, etc., a hospital fee of $5, an entrance fee, etc., of $10, and for certain articles supplied on requisition $17.50, making a total of $282.50 paid October 1, 1903.

This suit was brought by plaintiff to recover the money so paid by him to the defendant.

CHURCH, McMURDY & SHERMAN, for appellant.

JULE F. BROWER and SAMUEL B. KING, for appellee.

MR. PRESIDING JUSTICE BAKER delivered the opinion of the court.

The written application of plaintiff for the admission of his son to the academy, together with the printed catalogue and regulations of the academy, referred to in the application, constitute the contract between plaintiff and defendant. That contract provides that in case a cadet is dismissed, "no money will be refunded."

The declaration consists of the common counts, and the action is in substance an action for money had and received. "If," said Lord Mansfield, "one man takes another's money to do a thing and refuses to do it, it is a fraud, and it is at the election of the party injured either to affirm the agreement, by bringing an action for the non-performance of it, or to disaffirm the agreement *ab initio*, by reason of the fraud, and bring an action for money had and received to his use." Moses v. McFarlane, 2 Burr 1011; 4 Robinson's Prac. 560; Bannister v. Read, 1 Gil. 92; Weaver v. Bentley, 1. Caine 46. To recover the money paid on the contract, the plaintiff was bound to prove a breach of the contract by the defendant, and the question presented on this appeal is, was the dismissal of Cadet Manson, under the facts and circumstances shown by the evidence, a breach of the contract between the plaintiff, his father, and the defendant?

Under the regulations of the academy, any delinquency of a cadet was reported on the guard sheet, and the list of delinquencies was read daily. A cadet against whom a delinquency was so reported could apply to the commandant of cadets to have such.de-

linquency removed. The commandant also fixed the number of demerits for each delinquency. After he had so fixed the demerits, the number of demerits of each cadet was entered in a book and read at the end of the week. A cadet might then apply to the commandant to have a demerit removed. If the demerits of a cadet in any week exceeded six, he was assigned one hour extra duty for each demerit over six. The extra duty consisted of marching around a circular track carrying a gun. Between September 18 and November 16, 1903, Cadet Manson accumulated, according to his admission, 192 unremoved demerits, and according to the contention of defendant, 207. His demerits each week had exceeded six and he had each week for such demerits been required to do extra duty. Because of the excess of his demerit marks above six in a week, he was ordered to perform two hours' extra duty November 16. The regulations of the academy provide as follows:

"229. In the event of absence of proper medical officer, any Cadet feeling himself incapacitated for any duty may, upon application to the officer in charge, absent himself from such duty, but the Cadet shall be reported 'absent, claiming to be unfit for duty,' this report being subject to removal by the Commandant of Cadets, on recommendation of the medical officer, after examination of the Cadet."

The extra duty squad was under the charge of the officer of the day, under whom was the corporal of the guard.

Cadet Manson, without making application to anyone, left the extra duty squad and went to the commandant of cadets, and asked to be excused from marching longer, and was told to go to the nurse. He went to the nurse, who gave him some medicine and sent him back to duty. He went back, marched an hour and a half, and again, without making any application to be relieved from duty, left the extra duty squad and went to his room. Fifteen minutes later

the corporal of the guard came for him and he went back, completed his two hours' extra duty, excepting the time he was in his room, and was then put in arrest. The next morning he was called before the commandant of cadets, who told him that he could not stand his conduct of the night before, and sent him to the superintendent. He testified that the superintendent told him that his conduct of the night before was something they could not stand, "that he was very sorry he had to let me go." The superintendent testified that he gave Cadet Manson his dismissal; that he told him the commandant had recommended his dismissal because of the accumulation of his demerits and his violation of the rules of the academy the day before and during the entire fall; that he told Cadet Manson that his special violations of duty were the wilful destruction of property of the academy, and the leaving of the extra duty squad the night before without permission, and also his going beyond 200 demerit marks during the fall.

Among the regulations of the academy then in force were the following:

"152.   A Cadet receiving over two hundred demerits during one term shall be subject to dismissal."

"238.   The Superintendent and also the Commandant of Cadets have power to investigate violations of the regulations, disorders and breaches of discipline committed by Cadets."

"271. . Any Cadet who shall manifest an insubordinate or refractory spirit, evincing a disposition to resist the authorities of the Academy, thereby disturbing its peace and order, shall be forthwith sent to his home by the Superintendent."

The regulations also provide that one of the punishments to which a cadet shall be liable is dismissal; that "the Superintendent has the immediate government of the Academy * * * and all cases of severe discipline shall be referred to him for his judgment and approval." Cadet Manson did not, when called before

either the commandant of cadets or the superintendent, deny that he twice left the extra duty squad the day before without making an application to the officer in charge to be relieved. He testified on the trial that he so left the squad without application to be relieved, and gave as an excuse that he was ill. The regulations, as we have seen, gave a cadet the right to absent himself from any duty upon application to the officer in charge, upon his statement that he felt himself incapacitated for such duty, in which case he was reported "absent, claiming to be unfit for duty." The right to absent himself from duty by making application to the officer in charge, on the ground that he was unfit for duty, Cadet Manson did not attempt to exercise, but saw fit, without making such application, to twice leave the squad with which he had been assigned to extra duty because of his demerits. The regulations provide that the cadets of the defendant "shall constitute a military corps and be subject to military discipline." The acts of Cadet Manson in so leaving the extra duty squad were acts of insubordination, subversive of military discipline, or of any kind of discipline.

It was for the superintendent to determine what the punishment for such acts and conduct should be; whether it should be dismissal from the academy or some lighter punishment. The regulations conferred upon the superintendent the power to dismiss Cadet Manson for such actions, irrespective of the question whether his demerits for the term, up to that time, amounted to a few less or a few more than 200. The only requirement necessary, so far as concerns a review by a court of justice of his action in dismissing Cadet Manson, is that his action shall be so unreasonable and oppressive as to warrant a conclusion that he acted maliciously, unfairly, or from some improper motive, some motive other than the proper enforcement of the regulations of the academy and the maintenance of proper discipline. Koblitz v. Wes.

Res. Univ., 21 Ohio Cir. Ct. 144; Curry v. LaSalle
Sem., 168 Mass. 7; Fessman v. Seeley, 30 S. W. 268:
Kabus v. Seftner, 34 Misc. (N. Y.) 538; Homer School
v. Wescott, 124 N. C. 518.

We think that the evidence fails to show that the
action of the superintendent in dismissing Cadet Man-
son was unreasonable or oppressive, or any facts to
warrant or support a conclusion that in ordering such
dismissal the superintendent acted maliciously, un-
fairly or from any improper motive. It follows from
what has been said that, in our opinion, the evidence
is not sufficient to warrant or support a finding by the
jury that the dismissal of plaintiff's son by the defend-
ant was a breach of the contract between plaintiff and
defendant, and therefore is not sufficient to warrant or
support a recovery by the plaintiff from the defend-
ant of the money paid by the former to the latter on
the contract.

The judgment of the Circuit Court will be reversed,
with a finding of facts.

*Reversed, with finding of facts.*